IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CV-205-FL

| | | |
|---|---|---|
| LISA MCKINNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DUKE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on the parties' cross-motions for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. (DE 29, 33). Also before the court is defendant's motion to strike plaintiff's exhibit A, attached to her reply in support of her motion for summary judgment. (DE 44). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendant's motion to strike is granted. Plaintiff's motion for summary judgment is granted, and defendant's motion for the same is denied.

## STATEMENT OF THE CASE

Plaintiff commenced this action on May 10, 2019, alleging defendant violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq. by denying plaintiff's claim under a long-term disability insurance plan and refusing to pay plaintiff benefits under the plan.[1] On March 6, 2020, defendant filed the administrative record in the instant case, consisting of the summary plan description for the relevant insurance policy ("SPD" (DE 25-

---

[1] Plaintiff also named Liberty Life Assurance Company of Boston as a defendant in this action but stipulated to its dismissal without prejudice on July 10, 2019.

1)) and plaintiff's claim file ("CF" (DE 26-1, 26-2, 27-1, 27-2, 28-1, 28-2)).[2]  That same day, the

parties filed the instant cross-motions for summary judgment.  In the course of briefing her motion

for summary judgment, plaintiff filed with her reply an entry from the Dictionary of Occupational

Titles ("DOT").  Thereafter, defendant moved to strike the DOT entry.

## STATEMENT OF UNDISPUTED FACTS

A.    Plan Language

The undisputed facts in the instant case may be summarized as follows.  Defendant is the

Sponsor and Plan Administrator of a self-funded group long-term disability policy (the "Plan" or

"Policy") for its employees.  (SPD at 1–25).  The Plan provides participants with a monthly benefit

of up to 60% of a participant's base salary until the participant is eligible to retire, can no longer

show proof of disability, or defaults on a repayment agreement.  (Id. at 2, 7).

The Benefit Waiting Period is the length of time a participant must be continuously

partially or totally disabled before she qualifies to receive benefits.  (Id. at 7).  The Benefit Waiting

Period begins on the first day the participant's doctor states in writing that the participant is

disabled because of sickness or accidental injury, and no benefits are payable during this period.

(Id.).  A participant must be under the continuous care of a doctor during the Benefit Waiting

Period in order for benefits to be payable after the Benefit Waiting Period.  (Id.).  The Benefit

Waiting Period for Duke University Health System employees is 90 calendar days.  (Id.).

A participant is entitled to long term disability ("LTD") benefits if she suffers from Total

Disability, which means

you are unable to perform the essential duties of your own occupation during the
first 24 months of disability payments due to sickness or accidental injury.  After

---

[2]      For ease of reference, citations herein to pages in plaintiff's claim file are to the consecutive pagination
affixed by defendant (e.g., "McKinnon Claim File_000133"), rather than the nonconsecutive pagination assigned by
the court's case management and electronic case filing system ("CM/ECF").

24 months, you are unable to perform the essential duties of any occupation you are or could reasonably become qualified for by education, training, or experience.

(Id.). The Plan comes with limitations and conditions as well. Defendant is entitled to an offset for "other income" that participants or their dependents "receive or are eligible to receive because of your age, work for another employer or self-employment or Social Security disability or other retirement." (Id. at 9). Participants are required to apply for Social Security disability benefits in order to receive benefits under the Plan. (Id. at 10).

As Plan Administrator, defendant designated Liberty Life Assurance Company of Boston ("Liberty") as the "Disability Administrator" obligated "to review all disability claims and appeals filed under the Plan." (Id. at 15, 20). The Plan provides that Liberty "has the discretionary authority to make all initial determinations with respect to claims filed under the Plan and to decide all appeals of any denied claims." (Id. at 15). "The Plan Administrator has no discretionary authority with respect to reviewing disability claims and appeals." (Id.).

Upon request, defendant will provide a claimant with a claims kit to complete when submitting a claim and documents or information to support a claim for LTD benefits. (Id.). Among other things, the Plan provides that if a claim is denied, a claimant will receive a notice of denial explaining, among other things, "[t]he specific reasons for the denial;" "[a] description of any additional information or material necessary to perfect your claim and an explanation of why such information or material is needed;" and "[i]f applicable, the reason for not following the views of the treatment professional, medical or vocational experts, or a disability determination by the Social Security Administration." (Id. at 15–16).

"The Plan provides for two levels of appeal[,]" each of which "must be made in writing and may include written comments, documents, records, and other information relating to your claim even if you did not include that information with your original claim or, if applicable, your

first level appeal." (Id. at 16). Thereafter, "[t]he disability administrator will take all comments, documents, records and other information into account even if it was not submitted or considered in the prior review and determination and will provide a review that does not afford deference to the initial adverse decision . . . ." (Id.). As with an initial adverse decision, if an appeal is denied in whole or in part, the claimant will receive notification including "[t]he specific reason or reasons for the denial." (Id. at 16–17).

B.       Plaintiff's Long-Term Disability Benefits Claim

Beginning on July 8, 1991, plaintiff was employed by defendant as a Medical Records Coder II. (CF at 133, 183–84). As a full-time employee of Duke University Health System, plaintiff was a participant in the Plan. (Id. at 1). Plaintiff worked for defendant until May 2017. (Id. at 133). For several years prior to leaving her employment with defendant, plaintiff was diagnosed with cervical radiculopathy, facet degenerative disease, and lumbar disc disease. (Id. at 1094–1101).

1.       Plaintiff Initially Applies for Benefits

In August 2017, Liberty received plaintiff's claim for LTD benefits, asserting disability beginning May 16, 2017, resulting from fibromyalgia, cervical radicular pain, lumbar radicular pain, lumbar facet arthroplathy and pain of the left hip joint. (Id. at 133–34). Defendant provided Liberty with an Employer's Job Evaluation Form, which contained information regarding plaintiff's job and a job description. (Id. at 183–87). In support of her claim, plaintiff provided medical records from her primary physician, Dr. Joyce Copeland ("Copeland"), her pain management physician, Dr. Anne Fras ("Fras"), and medical records from as early as 2011 relating to issues with back and neck pain. (Id. at 1102–1391). Plaintiff also submitted a May 5, 2017,

Functional Capacity Evaluation ("FCE") by physical therapist Peggy Anglin ("Anglin"), and physical therapy notes from Laura Rapp ("Rapp"). (Id. at 163–82, 1281–89).

Copeland, plaintiff's doctor since 2002, submitted an attending physician statement dated April 6, 2017, diagnosing plaintiff with myalgia, diffuse myofascial pain, and facet arthropathy. (Id. at 139–40). Copeland identified a proposed treatment plan including biofeedback, injections, medication, work accommodation, and changes in position. (Id. at 140). She opined that plaintiff should be limited to no lifting, being able to stand or walk after 30 minutes of sitting and resting while at peak. (Id.). Copeland marked plaintiff's physical impairment with an arrow from moderate to severe limitation, explaining as of April 2017 plaintiff "is doing clerical work but now cannot maintain expected productivity levels." (Id.).

During plaintiff's first visit to her practice on January 8, 2016, Fras observed that plaintiff suffered from extreme tenderness in the midline of the spine at the low cervical/high thoracic area and lumbar area. (Id. at 624). Fras observed "marked pain behaviors" from plaintiff, such as significant difficulty rising from a chair. (Id.). Fras also observed plaintiff had a limited lumber and cervical range of motion. (Id.). Fras instructed plaintiff "to resume normal activities and to avoid bedrest." (Id. at 625). During plaintiff's October 5, 2017, physical examination, Fras observed that plaintiff was "in no acute distress," that her "[m]yofascial tenderness is inconsistent and dependent on the patient's level of distraction," but that plaintiff had tenderness in the spine and exhibited "[s]ignificant pain behaviors with any movement of all extremities and with ambulation." (Id. at 808).

Anglin's May 25, 2017, FCE concluded that plaintiff was "functioning below what is considered a [s]edentary level of physical work tolerances." (Id. at 164). Anglin based this conclusion on "[plaintiff's] neck and back pain as her most limiting factors affecting her overall

function." (Id.). Anglin reported that plaintiff "had difficulty tolerating a sitting position much more than 40 minutes at a time due to pain flares associated with sitting" and that plaintiff's "heart rate was consistently over 100 bpm throughout the testing afternoon and at times the client appeared tearful, indicating significantly disabling pain levels." (Id. at 164, 172, 175).

After receiving plaintiff's materials, Liberty contacted two third party providers to review plaintiff's claim through independent consulting physicians. (See id. at 9, 12, 314, 320, 1458–63). The first consulting physician, Dr. Howard Grattan ("Grattan"), a board-certified doctor in physical medicine and rehabilitation physician, submitted a report on plaintiff's claim on October 4, 2017. (Id. at 314–319). Grattan noted plaintiff's diagnoses of diffuse myofascial pain syndrome, diffuse body pain, pain of the left hip joint, cervical radicular pain, lumbar radicular pain, and lumbar facet arthropathy, but found that a diagnosis of fibromyalgia was not supported by the medical evidence because there were no findings of symmetrical fibromyalgia tender points on examination. (Id. at 317). Grattan opined that plaintiff's impairment was caused by lumbar radicular pain and lumbar facet arthropathy, observed that plaintiff's October 2013 MRI reportedly revealed a small L4-L5 disc bulge and a stable protrusion at L5-S1, and noted Fras and Anglin's observations that "significant pain behaviors were noted with any movement and with ambulation" and that plaintiff "struggled to sit for greater than 40 minutes at a time due to pain flares, and her heart rate was consistent with impairing pain levels." (Id.). Ultimately, Grattan concluded that plaintiff "would have the capacity to sustain full time employment with restrictions" including "walking and standing for 10 minutes at a time up to a total of 2 hours per day. Sitting unrestricted." (Id.).

The second consulting physician was Dr. Mauro Zappaterra ("Zappaterra"), another doctor with board certification in physical medicine and rehabilitation, who completed his report on

6

October 19, 2017. (Id. at 320–30). Zappaterra opined that the diagnoses supported by plaintiff's medical evidence are: diffuse myofascial pain, fibromyalgia, low back pain, lumbar spondylosis, lumbar disc extrusion, lumbar radiculopathy, sacroiliac joint pain, cervical stenosis, cervical spondylosis, mild degenerative pubic symphysis, depression, inter menstrual spotting, bloating, history of uterine fibroids, and hydrosalpinx. (Id. at 327). Zappaterra explained that plaintiff's course of care and symptoms correlate with her presentation. (Id. at 328). However, Zappaterra concluded that none of these diagnoses impaired plaintiff and that plaintiff had no medical restrictions or limitations because Fras directed plaintiff to resume normal activities and to avoid bed rest. (Id. at 327–28).

In addition to reviewing plaintiff's medical records, Liberty also requested and received an internal occupational analysis from Sharonda Hicks ("Hicks"), a certified rehabilitation counselor. (Id. at 1474–77). Based on plaintiff's job description provided by defendant, (see id. at 183–87, 1474–75), Hicks determined that plaintiff's job was analogous to "the following description in the DOT: Medical Record Coder (079.262-014), with associated O*NET Medical Records and Health Information Technicians (29-2071.00) and OOH Medical Records and Health Information Technicians." (Id. at 1475). Using the description provided in O*NET, Hicks determined plaintiff's occupation required her to

> [c]ompile, process, and maintain medical records of hospital and clinic patients in a manner consistent with medical, administrative, ethical, legal, and regulatory requirements of the health care system. Process, maintain, compile, and report patient information for health requirements and standards in a manner consistent with the healthcare industry's numerical coding system.

(Id.). To determine the physical demands of plaintiff's job, Hicks researched Indeed.com in September 2017 and reviewed a 2013 survey of incumbents from O*NET. (Id.). "[T]aking all of the information above into consideration," Hicks concluded that plaintiff's occupation required

her to perform work at the sedentary level of physical demand, based on the Department of Labor's definition of "sedentary work" in the DOT.[3]  (Id.).

On November 8, 2017, Liberty issued a notice to plaintiff in regard to her claim for LTD benefits.  (Id. at 2011–17).  Liberty explained the definition of disability under the Plan language and summarized plaintiff's claim and medical documentation.   (Id. at 2011–13).   After summarizing the medical opinions of Grattan and Zappaterra, as well as the occupational analysis of Hicks, Liberty informed plaintiff that "[b]ased on the medical information in relation to your occupation requirements, you do not meet your Plan's definition of disability throughout your plan's elimination period, and we must deny your claim for benefits."   (Id. at 2013–16).

2.     Plaintiff Appeals Her Initial Adverse Decision

On May 7, 2018, plaintiff appealed her initial adverse decision through counsel.  (CF at 24–26).  In support of her first appeal, plaintiff submitted updated medical records as well as a copy of her Social Security disability file.  (Id. at 620–865, 1451–72).

The updated records included analyses of MRIs ordered by Fras and dated October 25, 2017, and November 5, 2017, which provided extensive observations of plaintiff's spine.  (Id. at 45–46).  Plaintiff's MRIs showed "[m]ild spinal stenosis at C3-C4 which has slightly worsened

---

[3]    S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Positional requirements include:
- Constant sitting and fingering
- Frequent handling
- Occasional bending/stopping, twisting, walking, reaching (reaching can be reduced by moving objects an ergonomically-correct distance from the body)
- Occasional to No standing,
- No crouching/squatting, kneeling, climbing, crawling, balancing

(Id. at 1475–76).

from comparison exam[,]" "T11/12 small to moderate left foraminal extrusion . . . [,]" and "L5-S1 small grade 1 retrolisthesis. Moderate broad central extrusion abutting both S1 roots. No significant neural foraminal narrowing or spinal stenosis." (<u>Id.</u>). On November 16, 2017, Fras noted plaintiff was diagnosed with diffuse myofascial pain syndrome, that plaintiff was poorly tolerant of trials of increased medication, and that Fras could not offer any additional recommendations. (<u>Id.</u> at 35–36). Fras again recommended that plaintiff resume normal activities and avoid bedrest. (<u>Id.</u> at 36).

On December 12, 2017, Dr. Gloria Liu ("Liu") saw plaintiff for the first time since 2013. (<u>Id.</u> at 67). Liu noted that plaintiff had undergone a several treatments with no improvement in her pain symptoms, and that her pain was consistent with the finding on her cervical spine MRI and lumbar spine MRI. (<u>Id.</u> at 71). Liu suggested trial of a transforaminal epidural injection S1 on the left, therapy for diffused shoulder pain, and continued use of medication. (<u>Id.</u>). One week later, plaintiff saw Copeland, who noted plaintiff's medical history shows a work capacity assessment through occupational therapy showing the following:

> [plaintiff] is able to sit for up to 60 minutes at a time, approaching 4-5 hours total, or may be able to stand for up to 30-60 minutes at a time, but no more than 2 hours total with up to 30-60 minutes of walking included in that 2 hour standing total in a given work day. [Plaintiff] is not likely to be able to combine these maximum tolerances in any given workday as fatigue from maintaining one positional tolerance will limit tolerance in any subsequent position.

(<u>Id.</u> at 84). Copeland further noted that plaintiff has "chronic unrelenting pain that has not responded to multiple and multidisciplinary modalities" and that "[a]t this juncture I do not see how she could participate in any job in any meaningful manner." (<u>Id.</u> at 86).

Liberty contact another third-party vendor to obtain an additional independent review from a board-certified physical medicine and rehabilitation physician. (<u>Id.</u> at 6, 274, 1452–54). The requested physician, Dr. Neil Patel ("Patel") reviewed plaintiff's file, including her medical

9

records, and provided his report on June 4, 2018. (Id. at 274–84). Patel observed that plaintiff's diagnoses of cervical degenerative joint disease, large central disc extrusion C3-4 resulting in cord impingement and moderate degenerative foraminal stenosis C4-5, T11–12 small to moderate left foraminal extrusion, mild hip degenerative changes, L5-S1 disc protrusion, lumbar degenerative joint disease, lumbar disc disease, depression, anxiety, and type two diabetes mellitus were supported by the medical evidence. (Id. at 282). Patel noted plaintiff's chronic pain in numerous areas of her neck, back, and hip. (Id.). Patel opined that plaintiff "can sustain full time work capacity" subject to permanent restrictions, including occasional overhead activity, sitting for up to 30 minutes at a time with the ability to change positions for comfort for up to six hours in a day, standing for up to 15 minutes at a time for a total of two and a half hours in a day, and walking for up to 30 minutes at a time for a total of four hours in a day. (Id. at 282–83).

On June 11, 2018, Liberty noticed plaintiff's counsel that plaintiff failed to demonstrate that she was disabled. (Id. at 1997–2002). Liberty again set forth the basis of its initial decision based on Grattan, Zappaterra, and Hicks. (Id. at 1997–99). It noted plaintiff's clinical information submitted in support of her first appeal, including "office treatment notes, testing, consultations, and pharmacy records from multiple providers at Duke Health from September 2015 through February 2018." (Id. at 1999). Finally, Liberty explained Patel's medical opinions. (Id.). Ultimately, Liberty explained its denial as follows:

> In summary, we acknowledge that she may continue to experience symptoms associated with her conditions. However, the information does not contain exam findings, diagnostic test results, or other forms of medical evidence substantiating that her symptoms were of such severity, frequency, and duration that they resulted in restrictions and limitations rendering her unable to perform the duties of her occupation.

(Id. at 2000).

3.    Plaintiff's Second and Final Appeal is Denied

10

Plaintiff, through counsel, submitted her second appeal of Liberty's decision on August 9, 2018. (CF at 124–27). In support of the appeal, plaintiff included additional documentation. First, she included a letter from Fras dated July 26, 2018. (Id. at 1807). The letter summarized plaintiff's diagnoses and treatments. (Id.). It also explained that throughout plaintiff's treatment, "she was encouraged to maintain her activity level as tolerated, as is the standard recommendation for pain patients in general and to avoid the deconditioning associated with bedrest." (Id.). Copeland also provided a letter dated July 27, 2018, summarizing plaintiff's diagnoses, her medications, and the persistence of her symptoms over the course of several years. (Id. at 1805–06). Copeland also explained that plaintiff

> has retrolisthesis of C4 on C5 with bulging disc. This was found to be worsening over the course of several MRIs. She also has spinal canal narrowing at C3-C4. MRI of the lower spine was consistent with loss of disc space at L5 and S1 with some compression on the S1 nerve. She has failed conservative intervention.

(Id. at 1806).

Plaintiff also submitted a personal statement regarding her conditions and a second FCE from Anglin dated June 25, 2018. (Id. at 239–63, 1908–09). Anglin's second FCE again concluded that plaintiff was functioning below a sedentary level, explaining that plaintiff "demonstrated difficulty tolerating prolonged sitting and requested to lie down during part of the evaluation due to the pain that was provoked with sitting" and also that plaintiff's "lifting and walking tolerances have declined since her last FCE visit in 2017." (Id. at 242). Similar to the first FCE, the longest plaintiff was able to sit was just over 41 minutes within a total of just over two hours of sitting.[4] (Id. at 254–55). Plaintiff spent about nine minutes standing and nine minutes walking during the entirety of her appointment, and about 53 minutes continuously lying down.

---

[4] Consistent with this observation during testing, plaintiff had to stop one time during the one-hour drive from her home to the clinic due to experiencing pain. (Id. at 243).

(Id.). Finally, on September 27, 2018, plaintiff provided Liberty with a copy of the Social Security Administration's favorable decision regarding plaintiff's claim for Social Security disability benefits. (Id. at 1466–72).

In the meantime, Liberty once again sought an internal medicine review on September 12, 2018, this time from Dr. Neal McPhee ("McPhee"), a physician board certified in physical medicine and rehabilitation and pain management. (Id. at 15–16, 285–313, 1464–65). McPhee reviewed plaintiff's medical records, summarized plaintiff's medical notes, and provided a report of his findings on November 7, 2018. (Id. at 289–313). He determined that the "primary diagnosis causing functional impairment is chronic pain syndrome, and secondary diagnoses are spinal degenerative disc and joint disease as well as situational anxiety/depression." (Id. at 285). For these impairments, McPhee opined that plaintiff could work in a full time capacity with the following restrictions: sitting frequently, standing occasionally, walking occasionally, bending/twisting occasionally, squatting occasionally, climbing stairs/ladders occasionally, kneeling/crawling occasionally, and the ability to shift position from sitting to standing as needed for comfort. (Id. at 286).

In reaching his conclusion, McPhee expressed doubt as to the severity of plaintiff's reports of pain and her capabilities. With regard to plaintiff's MRIs, McPhee explained that "[a]lthough there has been some progression of degenerative disc and joint disease over time most notable at the L5-S1 level, she is neurologically intact and has functional range of motion." (Id.). He questioned the significance of the findings on the imaging based on failure to achieve expected benefit from prior treatments, and cited inconsistently reported tenderness, observed significant pain behaviors and nonspecific results of directed testing by specialists. (Id. at 287, 288). McPhee questioned Anglin's FCEs, opining that plaintiff did not give full effort in the exam because she

was neurologically intact and lives independently. (Id.). McPhee also noted plaintiff's positional tolerances, contended that such positional tolerances could be accommodated by a sit-to-stand workstation, and expressly disagreed with Copland's assessment that plaintiff is unable to sustain employment. (Id. at 287–88).

McPhee discussed his findings with Copeland[5] and asked if flexion/extension x-rays of plaintiff's lumbar spine were available. (Id. at 308–09). Plaintiff provided the requested x-rays on October 29, 2018. (Id. at 233–36). McPhee reviewed the x-rays and was able to rule out instability at L5-S1 and noted that no subluxation was present. (Id. at 331). McPhee maintained his previous opinion that plaintiff could perform full time work. (Id.).

On November 16, 2018, Liberty informed plaintiff's counsel that plaintiff failed to prove disability. (Id. at 2019–27). Liberty first summarized its initial decision and first appeal and related evidence, along with the evidence submitted by plaintiff in support of her second appeal. (Id. at 2019–22). Liberty then summarized at length McPhee's findings, the report prepared by Hicks, the availability of sit-to-stand workstations, and the award of Social Security benefits. (Id. at 2022–24). From this information, Liberty concluded as follows:

> [w]e acknowledge that Ms. McKinnon had chronic symptoms and continued to experience symptoms associated with her medical conditions. Nevertheless, the available information does not contain physical or mental status examination findings, diagnostic test results, or other forms of medical evidence to establish that her symptoms and impairments were of such severity, frequency, and duration that they resulted in restrictions or limitations rendering her unable to perform the essential duties of her own occupation throughout and beyond the disability benefit waiting period.

(Id. at 2025). As with the initial decision and first appeal, (id. at 2007–08, 2017), Liberty explained to plaintiff her rights under ERISA. (Id. at 2026–27).

---

[5]     Grattan, Zappaterra, and Patel similarly tried to contact Copeland and Fras but were unsuccessful. (Id. at 281–82, 318, 326, 328).

# COURT'S DISCUSSION

A.    Standards of Review

    1.    Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations and citations omitted). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2.      ERISA

Under ERISA, if an employee benefit plan grants discretion to an employer to administer a benefit plan, the court's inquiry on review is limited to a determination whether the administrator's decision to deny benefits constituted abuse of discretion. Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000). The parties agree that the documents of relevance here grant discretion to Liberty, defendant's designee, to administer defendant's long-term disability benefits plan. (See SPD at 15). Therefore, the abuse of discretion standard applies to this review. See DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011).

15

Under the abuse of discretion standard, the court will not disturb the determination of a plan administrator if the determination is reasonable. Donovan v. Eaton Corp., Long Term Disability Plan, 462 F.3d 321, 326 (4th Cir. 2006). A plan administrator's "decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. at 322. "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotations omitted). The standard is met by "more than a mere scintilla of evidence but . . . less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

To evaluate whether a plan administrator's decision is reasonable, courts in the Fourth Circuit consider:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth, 201 F.3d at 342–43). Not all factors will be relevant in every case. See Helton v. AT&T Inc., 709 F.3d 343, 357 (4th Cir. 2013).

B.    Analysis

1.    The Plan

"The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." Lockhart v. United Mine Workers of Am. 1974 Pension Tr., 5 F.3d 74, 78 (4th Cir. 1993). The Plan provides that a claimant is entitled to LTD benefits if totally disabled, which means:

you are unable to perform the essential duties of your own occupation during the first 24 months of disability payments due to sickness or accidental injury. After 24 months, you are unable to perform the essential duties of any occupation you are or could reasonably become qualified for by education, training, or experience.

(SPD at 7). The parties dispute whether plaintiff is totally disabled as defined by the Plan.

2.       Vocational Assessment

Before turning to the merits of plaintiff's claim, the court briefly addresses defendant's motion to strike plaintiff's attachment to her reply in support of her motion for summary judgment. The attachment is a screenshot of a webpage with DOT job description for "Medical Record Technician," last updated in 1988, which identifies the occupation as "light work." (DOT Exhibit (DE 43-1) at 4–6). The attachment also shows that "Medical Record Coder" is not a DOT title. (Id. at 2).

"Generally, consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion." Id. at 352 (citing Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994)). However, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case" in those limited instances "when such evidence is necessary to adequately assess the Booth factors and the evidence was known to the plan administrator when it rendered its benefits determination." Id. at 356.

Assuming arguendo plaintiff's contention that Hicks meant to cite the DOT job title attached to her reply, such erroneous citation by Hicks in her report does not call into question the adequacy of her vocational analysis. Hicks relied upon the DOT and associated descriptions from the O*NET and OOH, noting specifically the entry on the O*NET that Hicks believed to best correspond with plaintiff's job. (CF at 1475). To determine the physical demands of plaintiff's job, Hicks relied upon significantly more current sources than the DOT, such as job listings on

17

Indeed.com in September 2017 and a 2013 survey of incumbents from O*NET. (Id.). Taking all this information into consideration, Hicks concluded that plaintiff's occupation was sedentary work. (Id.). Hick's vocational assessment, and defendant's adoption of it, was the product of deliberate, principled reasoning and supported by substantial evidence. Accordingly, defendant's motion to strike is granted, and defendant's classification of plaintiff's work as sedentary was proper.

     3.    Medical Evidence

In reviewing a claim under ERISA, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Furthermore, "it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented." Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999); see also Lown v. Continental Casualty Co., 238 F.3d 543, 546 (4th Cir.2001) (upholding, on de novo review, the denial of benefits against the opinions of three treating physicians where the insurer "determined that [the claimant's] documentation was inadequate to prove a total disability because of the lack of test results or other objective evidence to support the disability").

However, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker, 538 U.S. at 834. Equally, it is not reasonable to rely upon a medical opinion that is supported "by misreading some evidence and by taking other bits of evidence out of context." Myers v. Hercules, Inc., 253 F.3d 761, 768 (4th Cir. 2001). It is not reasonable to rely upon a consulting physician's opinion if that

opinion is not supported by substantial evidence. See, e.g., DuPerry, 632 F.3d at 873–74; White v. Sun Life Assur. Co. of Canada, 488 F.3d 240, 255–56 (4th Cir. 2007), abrogated on other grounds by Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99, 104–05 (2013); Donovan, 462 F.3d at 327; Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301, 308–09 (4th Cir. 2004), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116–17 (2008).

Applying the relevant standard under ERISA, defendant's decision to deny plaintiff LTD benefits was not supported by substantial evidence. As summarized herein, plaintiff presented several years' worth of treatment notes documenting neck and back pain and showing failure of numerous direct interventions by health providers to reduce such pain; her treating physician's repeated opinion that plaintiff was unable to maintain requisite productivity doing clerical work; two FCEs determining that plaintiff was functioning below a sedentary level based on a battery of various tests with discussion of those tests significance; MRIs showing significant abnormalities in plaintiff's spine; letters from plaintiff's treating physicians clarifying their statements where construed by consulting physicians at previous levels of consideration; a personal statement from plaintiff regarding her condition; plaintiff's social security disability file; and a social security disability award from the Social Security Administration without need for evidentiary hearing before an ALJ. This evidence, both objective and subjective, makes clear that plaintiff is impaired by spinal and joint injuries and consequently has tremendous difficulties, including sitting, standing, and walking for extended periods of time.

In contrast, each of the consulting physician opinions relied upon by Liberty is unpersuasive on the issue of plaintiff's total disability. Turning first to Grattan, he opined that plaintiff's lumbar radicular pain and lumbar facet arthropathy caused "tenderness throughout the spine, decreased and painful lumbar range of motion, inconsistent myofascial tenderness

dependent on the claimant's level of distraction, decreased sensation and allodynia in the left lower extremity, and a stiff gait." (CF at 317). He also observed that "[s]ignificant pain behaviors were noted with any movement and with ambulation" and that during plaintiff's first FCE "[s]he struggled to sit for greater than 40 minutes at a time due to pain flares, and her heart rate was consistent with impairing pain levels." (Id.). Inexplicably, Grattan determined that plaintiff was not restricted at all as to sitting. (Id.). Grattan's opinion that plaintiff is capable of constantly sitting, as is required for sedentary work according to defendant's own vocational consultant, is not supported by substantial evidence.

Turning to Zappaterra, he identified plaintiff's diagnoses and confirmed that plaintiff's course of care and symptoms correlate with plaintiff's presentation, but opined that none of plaintiff's diagnoses caused impairment, relying upon the comment by Fras that plaintiff is to resume normal activities and avoid bedrest. (Id. at 327–28). Zappaterra's contradictory statements highlight his failure to carefully review plaintiff's medical documentation. The very record that Zappaterra hones in on from August 17, 2017, notes that plaintiff was experiencing low back pain and neck pain, and that medication and treatments such as lidocaine infusion failed to mitigate her symptoms. (Id. at 802). Had Zappaterra conducted a thorough review of Fras' notes in their entirety, Copeland's notes, Anglin's first FCE, or the 2013 MRI explicitly relied upon by Grattan which included spinal abnormalities, it would have been abundantly clear that his reliance on Fras' single comment to find no impairments was not supported by substantial evidence. The letter submitted by Fras in support of plaintiff's second appeal confirms Zappaterra's patent error, clarifying that such a note is a standard recommendation to pain patients to maintain her activity level "as tolerated" and to "avoid deconditioning" associated with bedrest.[6] (Id. at 1807). Even

---

[6] Defendant argues that it could disregard the Fras and Copeland letters because they were "self-serving" on the part of plaintiff. Even under ERISA's abuse of discretion standard, the mere fact that plaintiff submitted evidence

defendant's three other consulting physicians recognized that plaintiff had at least some impairments to her ability to work caused by her diagnoses. Thus, Zappaterra's medical opinion is not supported by substantial evidence.

Turning to plaintiff's first appeal, Patel accepted as supported by the medical evidence numerous issues affecting plaintiff's spine and joints, and opines that plaintiff's pain "will affect impairments when lifting, reaching all planes, doing overhead activities, fingering/typing, sitting, standing, walking, kneeling, bending, stooping, climbing, crawling and squatting." (Id. at 282). With these limitations in mind, Patel opined that plaintiff "can sit for up to 30 minutes at a time with the ability to change positions for comfort up to [six] hours in a day." (Id. at 282–83). Patel also indicated that plaintiff can stand for up to 15 minutes at a time for a total of two and a half hours in a day and walk for up to 30 minutes at a time for a total of four hours in a day. (Id. at 283). Patel's analysis does not buttress defendant's decision to deny plaintiff LTD benefits. Patel's assessment of plaintiff's limited ability to sit, stand, and walk must be read in the context of the mass of evidence including the MRIs, FCEs, treatment notes, and plaintiff's previous work accommodations demonstrating that plaintiff cannot sit, walk, or stand for extended periods identified by Patel without time to lie down or rest to control the pain from her impairments. (See, e.g., id. at 28, 30, 41, 42, 53, 166, 172, 175, 254–55, 1806). As discussed above in regard to Grattan, sedentary work requires an employee to sit constantly, which is more than Patel opines plaintiff can do given her impairments. (See id. at 1475–76). Thus, Liberty's reliance upon Patel's opinion to determine plaintiff was not totally disabled is not reasonable.

---

in support of her claim cannot be a basis to disregard such evidence. See Black & Decker, 538 U.S. at 834. Absent actual evidence in the record calling into question the credibility of the statements made by Fras and Copeland, two medical doctors employed by defendant, plaintiff's evidence is no more "self-serving" than Liberty's reliance on paid consultants to render a medical opinion.

Finally, McPhee's medical opinion is riddled with assessments not supported by the evidence in this case. Despite diagnosing plaintiff with spinal degenerative disc and joint disease and noting a progression of the disease, McPhee misrepresents plaintiff's impairments by characterizing her as a "neurologically intact" individual. (Id. at 285, 286, 287). McPhee cites plaintiff's 2013 MRIs for the proposition that plaintiff has no "foraminal narrowing" or "spinal canal," but fails to address 2017 MRIs observing these exact phenomena in several places along plaintiff's spine. (See id. at 45–46, 287). He questions the validity of the imaging when direct interventions by treating providers failed to achieve expected benefit. (See, e.g., id. at 48, 287). Such a result confirms the severity of plaintiff's impairments, rather than undermines the validity of the MRIs. He also touts plaintiff's ability to live independently without acknowledging the limitations on plaintiff's daily life due to her impairments, such as significantly slower ability to do chores, inability to engage in previous life activities, and the need to take breaks from even sedentary tasks such as driving. (See, e.g., id. at 245, 287, 1908).

Without any meaningful discussion of the statistical and observational data in the FCEs used to objectively assess plaintiff's impairments, McPhee opined that 2017 and 2018 FCEs were merely based on plaintiff's subjective complaints, "invalid" because "full effort was not given," and "unlikely a representation of her maximal abilities." (See, e.g., id. at 168–81, 247–61, 287). McPhee also repeatedly considered some aspects of the FCEs while ignoring others. For example, he noted that plaintiff could sit over 40 minutes at one time and walk 50 feet in 18 second without antalgia, but ignored other important information such as the fact that in both FCEs, plaintiff spent over 40–50 minutes consecutively lying down in sessions lasting just over three hours and was able to spend very little time standing or walking. (Id. at 175, 254–55, 287).

These numerous oversights by McPhee should have given Liberty pause, particularly with regard to McPhee's assessment of plaintiff's work capabilities. McPhee opines that plaintiff can sit frequently. (Id. at 287). As discussed above, plaintiff's job requires her to sit constantly. (Id. at 1475–76). Apparently aware of this problem by the time of plaintiff's second appeal, Liberty seized on McPhee's opinion that plaintiff can stand occasionally and reasoned that a sit-to-stand workstation could accommodate her impairments. (Id. at 287, 2035). However, McPhee's assessment that plaintiff can stand occasionally, which is defined as up to 1/3 of the workday, is not supported by substantial evidence for the reasons discussed above. (See, e.g., id. at 84, 175, 254–55, 283, 317). McPhee also erroneously assumed that these two capacities could be stitched together to form one whole workday based on a sit-to-stand work accommodation. There is not substantial evidence in the record that prolonged periods of standing relieve the pain caused by plaintiff sitting for prolonged periods of time. Indeed, the record contains abundant evidence that sitting and standing both aggravate plaintiff's conditions, and that resting or lying down provides plaintiff relief. (See, e.g., id. at 28, 67, 73, 84, 166, 172, 173, 175, 254–55, 284). In sum, Liberty's wholesale adoption of McPhee's analysis is not the product of principled, deliberate decision making and based on substantial evidence.

Liberty relied upon ill-conceived opinions of its consulting physicians to determine plaintiff was not totally disabled. In the face of a deluge of subjective and medical evidence to the contrary, those consulting physicians provided unreliable functional assessments that in some instances do not even show plaintiff is capable of performing sedentary work. Under the terms of the Plan, Liberty's decision was not reasonable and constituted an abuse of discretion. Accordingly, summary judgment will be granted to plaintiff and denied to defendant.[7]

---

[7] Plaintiff asks the court to award prejudgment interest. "ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial

## CONCLUSION

Based on the foregoing, defendant's motion to strike (DE 44) is GRANTED. Plaintiff's motion for summary judgment (DE 29) is GRANTED, and defendant's motion for summary judgment (DE 33) is DENIED. Defendant is ORDERED to pay to plaintiff disability benefits from August 14, 2017, to the date of this order. Defendant is FURTHER ORDERED to provide plaintiff disability benefits for as long as she remains eligible for such benefits. The clerk is DIRECTED to close this case.

SO ORDERED, this the 5th day of August, 2020.

LOUISE W. FLANAGAN
United States District Judge

---

court." Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1030 (4th Cir. 1993) (en banc); see Fox v. Fox, 167 F.3d 880, 884 (4th Cir. 1999). Because plaintiff failed to brief the issue of prejudgment interest, the court declines to award prejudgment interest. If plaintiff wishes for the court to revisit its determination, she may file an appropriate motion. See Fed. R. Civ. P. 59(e).

24